**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **HELEN MARTIN GILBERT, as the surviving** | * | |
| **Sister and Administrator of the Estate of** | * | |
| **EURIE LEE MARTIN** | * | |
| **Plaintiffs,** | * | |
| | * | **CIVIL ACTION NO. _____** |
| **v.** | * | |
| | * | **Jury Trial Demanded** |
| **HENRY LEE COPELAND, in his individual** | * | |
| **capacity; MICHAEL HOWELL, in his individual** | * | |
| **capacity; and RHETT BUTLER SCOTT, in his** | * | |
| **individual capacity,** | * | |
| **Defendants,** | * | |

**COMPLAINT FOR DAMAGES**

Plaintiff HELEN M. GILBERT, as Administrator of the Estate and as surviving sister of Eurie Lee Martin ("Plaintiff"), files this Complaint for Damages against Defendants HENRY LEE COPELAND (former Washington County Deputy Sheriff); MICHAEL HOWELL (former Washington County Deputy Sheriff); and RHETT BUTLER SCOTT (former Washington County Deputy Sheriff), (collectively "Defendants"), pursuant to 42 U.S.C. §§ 1983 and 1988. Jurisdiction of this matter is founded upon 28 U.S.C. §§ 1331; 1343(a) (3), (4). In support of her Complaint, Plaintiff shows this Honorable Court the following:

**INTRODUCTION**

1. This is a civil action arising from the homicide of Eurie Lee Martin and asserting claims under federal law for the Defendants' deprivation of Mr. Martin's federal constitutional

rights.   Plaintiff demands a jury trial and seeks an award of economic damages, compensatory damages, and punitive damages, as well as an award of attorneys' fees and costs.

## THE PARTIES

2.  Plaintiff Helen Martin Gilbert is a resident citizen of Washington County, Georgia. She is the sister and next of kin of the late Eurie Lee Martin and brings this action as Administrator of his Estate.

3.  Defendant HENRY LEE COPELAND ("Copeland") is or was employed by the Sheriff of Washington County, Georgia as a deputy sheriff. At all times relevant to this complaint, Defendant Copeland acted under the color of state law and in his capacity as a Washington County deputy sheriff. Defendant Copeland is sued in his individual and supervisory capacities.  When served with the Summons and Complaint in the manner required by law, Defendant Copeland shall be subject to the jurisdiction of the Court.

4.  Defendant MICHAEL HOWELL ("Howell") is or was employed by the Sheriff of Washington County, Georgia as a deputy sheriff. At all times relevant to this complaint, Defendant Howell acted under the color of state law and in his capacity as a Washington County deputy sheriff. Defendant Howell is sued in his individual capacity.  When served with the Summons and Complaint in the manner required by law, Defendant Howell shall be subject to the jurisdiction of the Court.

5.  Defendant RHETT BUTLER SCOTT ("Scott") is or was employed by the Sheriff of Washington County, Georgia as a deputy sheriff. At all times relevant to this complaint, Defendant Scott acted under the color of state law and in his capacity as a Washington County deputy sheriff. Defendant Scott is sued in his individual capacity.  When served

with the Summons and Complaint in the manner required by law, Defendant Scott shall be subject to the jurisdiction of the Court.

## JURISDICTION AND VENUE

6.  This action arises under the authority vested in this Court by virtue of 28 U.S.C. §1331 and 28 U.S.C. § 1343(a)(3)(4).

7.  Upon service of process of the Summons and Complaint, this Court acquires jurisdiction of the Defendants under Fed. R. Civ. P. 4(k)(1)(A).

8.  Venue is proper in the Macon Division of the Middle District of Georgia under 28 U.S.C. § 1391(b) because all actions complained of occurred within the boundaries of this District, and Defendants reside within the District.

9.  Additionally, at least one of the Defendants is a citizen of the territorial area within the Middle District of Georgia.

## FACTUAL ALLEGATIONS

10.  This lawsuit arises from an incident on July 7, 2017, when Defendants Copeland, Howell, and Scott, tased, physically assaulted, and killed Mr. Eurie Lee Martin, age 58, while they unlawfully detained, tased, and physically assaulted Mr. Martin.

11. As of the filing of this lawsuit, Defendants Copeland, Howell, and Scott have been fired from their positions as Deputy Sheriffs with the Washington County Sheriff's Office.

12. As of the filing of this lawsuit, Defendants Copeland, Howell, and Scott have been indicted for Mr. Martin's death.

13. Defendants Copeland, Howell, and Scott have all been indicted in an eight-count indictment by a Washington County Grand Jury on the following charges in connection with Mr. Martin's death:

a.  Count 1 – Felony murder, while in the commission of false imprisonment, unlawfully causing the death of Eurie Lee Martin, through the use of force, by tasing and physically assaulting Mr. Martin;

b.  Count 2 - Felony murder, while in the commission of aggravated assault, unlawfully causing the death of Eurie Lee Martin, through the use of force, by tasing and physically assaulting Mr. Martin;

c.  Count 3 – Involuntary manslaughter, while in the commission of reckless conduct, unlawfully causing the death of Eurie Lee Martin, through the use of force, by tasing and physically assaulting Mr. Martin;

d.  Count 4 – Involuntary manslaughter, while in the commission of simple assault, unlawfully causing the death of Eurie Lee Martin, without any intention to do so, through the use of force, by tasing and physically assaulting Mr. Martin;

e.  Count 5 – False imprisonment, while acting without legal authority and in violation of Eurie Lee Martin's personal liberty, unlawfully confine and detain Mr. Martin;

f.  Count 6 – Aggravated assault, by making an unlawful assault on Eurie Lee Martin's person, with a deadly weapon, a taser, by use of force (by tasing and physically assaulting Mr. Martin);

g.  Count 7 – Simple assault, by committing unlawful acts which placed Eurie Lee Martin in reasonable apprehension of immediately receiving a violent injury by use of force, through tasing and physically assaulting Mr. Martin; and

h.  Count 8 – Reckless conduct, by unlawfully causing bodily harm to Eurie Lee Martin, by consciously disregarding a substantial and unjustifiable risk that their

acts of force (tasing and physically assaulting Mr. Martin) would cause harm to Mr. Martin and the disregard constituted a gross deviation from the standard of care which a reasonable person would exercise in the situation.

14. The Defendants committed the above-referenced acts against Eurie Lee Martin, while acting under color of law as sworn law enforcement officers of the Washington County Sheriff's Office and while acting in the course and scope of their employment with said Office.

15. The above-referenced acts, among others, were a direct, legal, and proximate cause of Eurie Lee Martin's unlawful death.

16. The criminal prosecution of the Defendants is ongoing as of the date of the filing of this lawsuit.

**The Defendants' Legally Unjustifiable Mistreatment of Eurie Lee Martin**

17. On July 7, 2017, during the daylight hours between 7:30 p.m. and 8:00 p.m., Mr. Martin was walking through the Deepstep Community on a public roadway from his home in Milledgeville, Georgia to his sister's house in Sandersville, Georgia, for a birthday celebration.

18. The heat index exceeded 100 degrees.

19. The Washington County Sheriff's Office received a phone report of a black man, Mr. Martin, walking along a public roadway.

20. The phone call to the Washington County Sheriff's Office did not indicate that Mr. Martin had committed a crime.

21. The phone call to the Washington County Sheriff's Office did not indicate that Mr. Martin was in the act of committing a crime.

22. The phone call to the Washington County Sheriff's Office did not indicate that Mr. Martin had threatened or posed a threat to any citizen.

23. The phone call to the Washington County Sheriff's Office did not indicate that Mr. Martin had been or was in possession of any weapon.

24. Responding to the phone report, Defendant Howell drove his patrol vehicle to Mr. Martin's location, finding Mr. Martin walking towards Sandersville, Georgia along Deepstep Road, a two-lane highway, in Washington County, Georgia.

25. At the time he encountered Mr. Martin, Defendant Howell knew only that Mr. Martin was a black man, who had committed no reported criminal offense, walking along a public roadway.

26. From his patrol vehicle, Defendant Howell attempted to speak with Mr. Martin.

27. Mr. Martin declined the invitation for a verbal encounter and responded to Defendant Howell's efforts to engage him in conversation by asking Howell "who are you," and continued walking along a public roadway.

28. Defendant Howell then radioed for backup law enforcement assistance.

29. Defendant Howell then activated his blue lights and slowly followed behind Mr. Martin in his patrol vehicle.

30. At this point, Defendant Howell activated his vehicle's dashboard recording system, which recorded audio and video.

31. The dashboard camera video showed Mr. Martin lawfully walking on the left side fog line of Deepstep Road.

32. Deepstep Road had no sidewalks.

33. Defendant Copeland responded to Defendant Howell's call for backup help about two and a half minutes later.

34. Defendant Copeland approached from the opposite direction of Deepstep Road with his vehicle's blue lights and dashboard camera activated.

35. Like Defendant Howell, at the time Defendant Copeland arrived and saw Mr. Martin, he was aware only that Mr. Martin was a black man walking on a public roadway, as to whom no criminal misconduct had been reported.

36. Defendant Copeland pulled his vehicle to the side of the road on which Mr. Martin was walking, blocking Mr. Martin's path.

37. Mr. Martin then began walking to the other side of the roadway to avoid Defendant Howell and Defendant Copeland.

38. Dashcam camera recordings show that Defendant Copeland exited his vehicle and told Mr. Martin to "come here," and then repeatedly told Mr. Martin to "get out of the road."

39. Mr. Martin then asked Defendant Copeland to leave him alone and further responded that he had done nothing.

40. At this point, Mr. Martin and Defendant Copeland walked out of the frame of both dashcam camera recordings.

41. A few moments later, Defendant Howell is shown approaching Defendant Copeland.

42. At this point, all three men are out of frame of both patrol vehicles' dashcam video but not audio recording.

43. When Martin is seen again, he is walking up the road with Defendant Howell and Defendant Copeland walking behind him in pursuit.

44. Three men in a truck drove upon the encounter as it was unfolding. One of the occupants made a video recording of events with a cell phone.

45. Defendant Howell then asked Defendant Copeland whether he had his TASER and told Defendant Copeland to "tase his ass."

46. Defendant Howell's order to Defendant Copeland to tase Mr. Martin came less than thirty (30) seconds after Defendants Howell and Copeland exited their vehicles.

47. At this point, it is undisputed that Mr. Martin committed no crime.

48. At this point, Defendant Howell had no lawful basis to employ any level of force against Mr. Martin.

49. At this point, Defendant Copeland had no lawful basis to employ any level of force against Mr. Martin.

50. At this point, Defendant Howell had no probable cause to arrest Mr. Martin.

51. At this point, Defendant Copeland had no probable cause to arrest Mr. Martin.

52.  Defendant Copeland then told Mr. Martin to stop, put his hands behind his back, and then warned Mr. Martin that he would be tased if he refuse. Mr. Martin did not comply.

53. Defendant Copeland then shot Mr. Martin with his TASER.

54. Defendant Copeland's TASER was then activated four (4) times with a total of twenty-eight (28) seconds of electrical discharge.

55. It is unclear for how long Mr. Martin actually received an electrical discharge.

56. Whatever the length of the electrical discharge, in response to it, Mr. Martin fell to the ground.

57. While on the ground, Mr. Martin's body repeatedly jerked, as if he was experiencing uncontrollable muscle contractions.

58. After some period of time, Mr. Martin removed the TASER probe from his arm, stood back up, and continued walking away from Defendants Copeland and Howell.

59. Defendant Howell then radioed Defendant Scott for backup, truthfully telling him that they had tased Mr. Martin, but falsely telling him that Mr. Martin, who was then walking away, was "still fighting."

60. While walking away and into the yard of a residence, Defendants Howell and Copeland closely followed Mr. Martin.

61. Defendant Scott arrived soon thereafter.

62. Defendants Howell, Copeland, and Scott then encircled Mr. Martin.

63. At the time he was encircled, Mr. Martin was standing with his arms by his side.

64. The Defendants told Mr. Martin to get on the ground.  Mr. Martin did not comply.

65. Defendant Scott, who was positioned more or less behind Mr. Martin, then lifted Mr. Martin's shirt and deployed his TASER from a close distance to Mr. Martin's back.

66. Defendant Scott activated his TASER a total of eight (8) times for a combined duration of sixty-one (61) seconds.  It is unclear how long Mr. Martin actually received an electrical discharge.

67. However long the electrical discharge to Mr. Martin, it resulted in him falling to the ground.

68. The three Defendants then converged on Mr. Martin.

69. The Defendants secured a handcuff to Mr. Martin's right hand.

70. Mr. Martin's left hand remained tucked under his body.

71. Defendants Howell and Copeland then shocked Mr. Martin with their TASERs in drive stun mode.

72. In drive stun mode, the head of the TASER is applied directly to the subject in a stabbing motion, causing an electrical charge to pass through the skin and flesh.  Using the TASER in the drive stun mode is a pain compliance technique.

73. While in the drive stun mode, Defendant Copeland's TASER was activated three times with a total electrical charge duration of twenty-five (25) seconds.  It is unclear how long Mr. Martin actually received an electrical discharge.

74. Upon information and belief, Defendant Howell used Defendant Scott's TASER and deployed it in the drive stun mode against Mr. Martin.

75. At some point, the Defendants were able to secure Mr. Martin's left hand with handcuffs.

76. Upon information and belief, the Defendants continued to deploy their TASER against Mr. Martin, while Mr. Martin was on the ground.

77. The three Defendants then applied their collective body weight to Mr. Martin as Mr. Martin was on the ground, not resisting.

78. Martin can be heard crying out in pain exclaiming what sounds to be "they killing me," before his voice slowly fades to silence.

79. Mr. Martin did not survive the combined effects of the tasings, physical assaults, and the Defendants' combined, suffocating body weight on his person.

80. As Mr. Martin lay on the ground, face down and no longer moving, one deputy callously remarked, "Damn that was an idiot".

81. The three eyewitnesses said they never saw Martin offer any violence to the Defendants.

82. The various angles captured on the video show Martin attempting to walk away throughout the encounter.

83. A first responder who arrived at the scene found that Mr. Martin did not have a pulse and began performing CPR on him.

84. Mr. Martin, however, could not be resuscitated and died at the scene.

85. In total, Mr. Martin was tased multiple times – fifteen times in just over four minutes.

86. Defendants Copeland, Howell, and Scott made the decision to physically restrain Mr. Martin in a prone position, face down on the ground.

87. Fatally for Mr. Martin, the three (3) Defendants restrained him face down to the ground, while applying force to all four of Mr. Martin's extremities and to his back.

### The Defendants Failed to Provide Medical Care to Mr. Martin

88. Defendants repeatedly tased Mr. Martin, physically assaulted him, and applied their collective body weight to his person to effectively suffocate him, rendering Mr. Martin prone on the ground, clearly injured, and virtually immobilized.

89. Despite being aware of the serious injuries they had inflicted on Mr. Martin the Defendants failed to render any medical aid to him.

90. Instead, one of the Defendants, upon observing Mr. Martin's prone and immobile body on the ground, made a pejorative reference to Mr. Martin, calling him an idiot.

91. Defendants failed to provide Mr. Martin with any medical attention whatsoever, even after it would have been clear to any reasonable law enforcement officer that he required immediate medical attention and care.

92. Even as Mr. Martin lay dying, the Defendants mocked him and failed to attend to him.

### Eurie Lee Martin Dies Because He Asked For A Drink of Water

93. Mr. Eurie Lee Martin died because he asked a resident of Deepstep Road for a drink of water, without ever entering onto the property of any resident he asked.

94. According to climatological data for July 7, 2017, the air temperature during the time of Martin's walk on that evening was approximately 90 degrees Fahrenheit with 71% humidity.

95. An air temperature of 90 degrees Fahrenheit combined with a 71% relative humidity creates a heat index temperature (apparent temperature) of 107 degrees Fahrenheit.

96. One of the homeowners whom Mr. Martin asked for a drink of water apparently called 911 to report Mr. Martin.

97. The homeowner described Mr. Martin on the 911 recording as a "black man, probably 50-plus-years-old, about 6'3", 220 pounds," and saying that he, "didn't like the look of him".

98. At no time during the 911 call did the homeowner indicate that Mr. Martin had merely asked for a drink of water.

### The Autopsy of Eurie Lee Martin's Body

99. Following his death, an autopsy was performed on Mr. Martin's body.

100. The autopsy revealed the cause of Mr. Martin's death was "Cardiac arrhythmia during police restraint."

101. The autopsy revealed the cause of Mr. Martin's death was "homicide."

102. The Medical Examiner who conducted the autopsy concluded that Mr. Martin's death was caused by "homicide."

103. According to the Georgia Bureau of Investigation Forensic Sciences Division, to a medical examiner, the term "homicide" means that "the death was caused by the actions of another person."

104.    In this instance, the Washington County grand jury concluded that Mr. Eurie Lee

Martin's death was murder and that Defendants Copeland, Howell, and Scott murdered Mr.

Martin.

### Mr. Martin's Interaction With The Defendants Was A First-Tier Encounter

105.    Generally, in a constitutional sense, there are three (3) types of police-citizen

encounters.

106.    These encounters are classified as first-tier encounters, second-tier encounters, and

third-tier encounters.

107.    In a first-tier encounter, law enforcement officers may approach citizens, ask for

identification, and freely question the citizen without any basis or belief that the citizen is

involved in criminal activity, as long as the officers do not detain the citizen or create the

impression that the citizen may not leave.

108.    An officer may not use force to effectuate a first-tier encounter.

109.    An officer in a first-tier encounter has no authority to detain or restrict the liberty

of the citizen.

110.    In a first-tier encounter a citizen has the right to withdraw from the encounter or

resist any such use of force with a proportionate use of force.

111.    The Defendants' encounter with Mr. Martin was a first-tier encounter.

112.    Here, the Defendants had no basis or belief that Eurie Lee Martin had been involved

in criminal activity.

113.    Here, the Defendants had no authority to detain Mr. Martin or restrict his liberty.

114.    Here, at all times, Mr. Martin had the right to resist the Defendants' use of force

with a proportionate use of force.

115.     Though there is no evidence that Mr. Martin employed any resistance to the Defendants' use of force against him, in this first-tier encounter he would have been within his federal constitutional rights to have done so.

116.     Though there is no evidence that Mr. Martin employed any proportionate use of force against the Defendants, in this first tier encounter he would have been within his federal constitutional rights to have done so.

117.     Here, at all times, Mr. Martin had the right to withdraw from the encounter with the Defendants.

118.     By attempting to walk away from the Defendants in this first-tier encounter, Mr. Martin was acting within his federal constitutional rights.

### The Defendants Violated Numerous Policies Enacted by the Sheriff of Washington County That Were in Force and Effect on July 7, 2017

119.     As of July 7, 2017, the Sheriff of Washington County had adopted various policies governing its deputies that were based on proper law enforcement procedures.

120.     What constitutes proper law enforcement procedures emanates from three sources: 1) the procedures that a reasonable law enforcement agency would adopt; 2) the standard procedures that most law enforcement agencies have adopted; or 3) the actual procedures that the agency employing the pursuing officer in a particular case has adopted.

121.     The Standard Operating Procedures of the Sheriff of Washington County, set forth below, most of which were adopted August 1, 2014, are the procedures a reasonable law enforcement agency would adopt.

122.     The Standard Operating Procedures of the Sheriff of Washington County, set forth below, most of which were adopted August 1, 2014, reflect the standard procedures that most law enforcement agencies have adopted.

123.     The Standard Operating Procedures of the Sheriff of Washington County, most of which were adopted August 1, 2014, are the procedures the Sheriff of Washington County actually adopted and that were in force and effect on July 7, 2017.

124.     Standard Operating Procedure ("S.O.P.") 7-1, adopted by the Sheriff of Washington County on August 1, 2014, is titled "Stop, Arrest & Search of Prisoners."

125.     S.O.P. 7-1 (IV)(A)(2) provided that in "Consensual Contact" with a citizen a deputy "may not take any steps through words or conduct to stop the person's movement under this type of stop."

126.     The Defendants violated S.O.P. 7-1 (IV)(A) in that they took steps, in both words and/or conduct, to stop Mr. Martin's movement.

127.     S.O.P. 7-1 (IV)(B)(2) provided that "[a]nonymous tips that merely describe a person's location and physical/clothing description without providing a prediction of the subject's future actions that can be corroborated by law enforcement prior to contact are insufficient to justify a stop or frisk."

128.     The Defendants violated S.O.P. 7-1 (IV)(B)(2) in that it prohibited them from using reasonable force short of deadly force or to detain Mr. Martin for any amount of time to investigate further, as no anonymous tip provided a prediction of Mr. Martin's future actions that could be corroborated by the Defendants prior to contact with Mr. Martin.

129.     Accordingly, under S.O.P. 7-1 (IV)(B)(2) the Defendants had no justification for stopping Mr. Martin as they were aware of no facts and circumstances that would lead a reasonable law enforcement officer to conclude that criminal activity was afoot.

130.     The Defendants violated S.O.P. 7-1 (IV)(D) in arresting Mr. Martin because they lacked probable cause to believe that a crime had been committed and similarly lacked probable cause to believe that Mr. Martin had committed any such crime.

131.     The Defendants violated S.O.P. 8-5 (III), adopted by the Sheriff of Washington County on August 1, 2014, as they were prohibited from stopping and detaining Mr. Martin to conduct a field interview, as they could not point to specific facts, which, when taken together with rational inferences, reasonably warranted the stop.

132.     The Defendants violated S.O.P. 10(III)(B), adopted by the Sheriff of Washington County on August 1, 2014, as there was no justification for their use of deadly force against Mr. Martin.

133.     The Defendants violated S.O.P. 10(III)(C) as there was no justification for their use of deadly force against Mr. Martin.

## Count I

## 42 U.S.C. § 1983 – Violation of the 4th Amendment of the United States Constitution

134.     Defendants Copeland, Howell, and Scott, while acting under color of law, violated Mr. Martin's constitutional rights by seizing Mr. Martin and using excessive force against him, as described herein throughout, which resulted in Mr. Martin's injuries and death.

135.     Defendants' actions violated the constitutional rights guaranteed to Mr. Martin by the Fourth Amendment to the United States Constitution.

136.    Defendants' actions were not taken in good faith and were in violation of clearly established law.

137.    Defendants used excessive force at the time they unlawfully deprived Mr. Martin of his liberty, by tasing him, physically assaulting him, depriving him of adequate oxygenation by placing their collective weight on his person, and ultimately killing him.

138.    Defendants' actions were unnecessary, unreasonable, unlawful, and unjustified.

139.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Martin was killed, and as a result, his Estate is entitled to both compensatory and general damages, including, but not limited to the full intangible value of his life; the full economic value of his life; severe emotional distress, mental anguish, and physical pain and suffering.

140.    Because the Defendants' actions were motivated by evil motive or intent and/or involved a reckless or callous indifference to Mr. Martin's federally protected rights, an award of punitive damages is appropriate to the fullest extent permitted by law.

## Count II

### 42 U.S.C. § 1983 – Failure to Intervene in Violation of The 4th Amendment of the United States Constitution

### Defendant Copeland

141.    Defendant Copeland had a duty to intervene when Defendants Howell and/or Scott were violating Mr. Martin's constitutional rights, which resulted in the infliction of excessive force upon Mr. Martin and ultimately Mr. Martin's death.

142.    Defendant Copeland observed and/or had reason to know that excessive force and/or deadly force was being inflicted upon Mr. Martin without a legitimate goal or justification.

143.     Defendant Copeland had the opportunity and means to prevent the excessive use of force, including deadly force, and/or violations of Mr. Martin's constitutionally protected rights from occurring.

144.     Not only was Defendant Copeland deliberately indifferent to Defendants Howell's and Scott's attack(s) on Mr. Martin, but he also encouraged the tasing, physical assault, and the collective body weight suffocation of Mr. Martin, even after Mr. Martin had been clearly injured and virtually immobilized.

## **Defendant Howell**

145.     Defendant Howell had a duty to intervene when Defendants Copeland and/or Scott were violating Mr. Martin's constitutional rights, which resulted in the infliction of excessive force upon Mr. Martin and ultimately Mr. Martin's death.

146.     Defendant Howell observed and/or had reason to know that excessive force and/or deadly force was being inflicted upon Mr. Martin without a legitimate goal or justification.

147.     Defendant Howell had the opportunity and means to prevent the excessive use of force, including deadly force, and/or violations of Mr. Martin's constitutionally protected rights from occurring.

148.     Not only was Defendant Howell deliberately indifferent to Defendants Copeland's and Scott's attack(s) on Mr. Martin, but he also encouraged the tasing, physical assault, and the collective body weight suffocation of Mr. Martin, even after Mr. Martin had been clearly injured and virtually immobilized.

**Defendant Scott**

149.     Defendant Scott had a duty to intervene when Defendants Copeland and/or Howell were violating Mr. Martin's constitutional rights, which resulted in the infliction of excessive force upon Mr. Martin and ultimately Mr. Martin's death.

150.     Defendant Scott observed and/or had reason to know that excessive force and/or deadly force was being inflicted upon Mr. Martin without a legitimate goal or justification.

151.     Defendant Scott had the opportunity and means to prevent the excessive use of force, including deadly force, and/or violations of Mr. Martin's constitutionally protected rights from occurring.

152.     Not only was Defendant Scott deliberately indifferent to Defendants Copeland's and Howell's attack(s) on Mr. Martin, but he also encouraged the tasing, physical assault, and the collective body weight suffocation of Mr. Martin, even after Mr. Martin had been clearly injured and virtually immobilized.

153.     As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Martin was killed, and as a result, his Estate is entitled to both compensatory and general damages, including, but not limited to the full intangible value of his life; the full economic value of his life; severe emotional distress, mental anguish, and physical pain and suffering.

154.     Because the Defendants' actions were motivated by evil motive or intent and/or involved a reckless or callous indifference to Mr. Martin's federally protected rights, an award of punitive damages is appropriate to the fullest extent permitted by law.

## Count III

### Deliberate Indifference Under 42 U.S.C. § 1983
### Against Defendants – Failure to Provide Medical Care

155.     As described above, Defendants Copeland, Howell, and Scott failed to ensure that

Mr. Martin received prompt and adequate medical care subsequent to the repeated tasings,

physical assaults, and body-weight suffocation he suffered.

156.     The Defendants actions exhibited deliberate indifference to Mr. Martin's serious

medical needs, were performed under color of state law, and violated Mr. Martin's rights

under the Fourteenth Amendment to the United States Constitution.

157.     As a direct result of the actions of the Defendants in failing to ensure that Mr. Martin

received prompt and adequate medical care, Mr. Martin was subjected to increased pain

and suffering, preceding his agonizing death.

158.     The conduct of Defendants Copeland, Howell, and Scott was willful and

exhibited a flagrant disregard for Mr. Martin's federally secured rights.  Accordingly,

these Defendants are legally liable to the Plaintiff under 42 U.S.C. § 1983.

## Count IV

### 42 U.S.C. § 1983 – Defendant Copeland's Supervisory Liability for Excessive Force

159.     On July 7, 2017, Defendant Copeland was a Sergeant with the Washington County

Sheriff's Office.

160.     Of the three individual defendants named in this action, Defendant Copeland was

the highest ranking and had supervisory authority over Defendants Howell and Scott.

161.     As set forth throughout this Complaint, Defendant Copeland personally

participated in the use of excessive force by the Defendants against Eurie Lee Martin, in

the form of multiple tasings, physical assaults, and the simultaneous application of their collective body weights to Mr. Martin's body, resulting in Mr. Martin's death.

162.     Defendant Copeland personally engaged in the multiple unlawful and unwarranted tasings of Mr. Martin.

163.     Defendant Copeland was present and in close physical proximity to Defendants Howell and Scott when they engaged in multiple tasings of Mr. Martin.

164.     Defendant Copeland failed to take any action(s) to stop Defendant Howell and Defendant Scott from engaging in multiple unlawful and unwarranted tasings of Mr. Martin, or to stop their tasings of Mr. Martin once they began.

165.     Defendant Copeland personally engaged in the unlawful and unwarranted physical assaulting of Mr. Martin.

166.     Defendant Copeland was present and in close physical proximity to Defendants Howell and Scott when they engaged in the unlawful and unwarranted physical assaulting of Mr. Martin.

167.     Defendant Copeland failed to take any action(s) to prevent Defendant Howell and Defendant Scott from physically assaulting Mr. Martin or to stop their physical assault once it began.

168.     Defendant Copeland personally engaged in the unlawful and unwarranted collective body weight suffocation of Mr. Martin.

169.     Defendant Copeland was present and in close physical proximity to Defendants Howell and Scott when they engaged in the unlawful and unwarranted collective body weight suffocation of Mr. Martin.

170.     Defendant Howell had a stature of 6'2" or 6'3" and a weight of approximately 340-350 pounds.

171.     Defendant Copeland failed to take any action(s) to prevent Defendant Howell and Defendant Scott from engaging in the body weight suffocation of Mr. Martin or to stop these efforts once they began.

172.     Defendant Copeland personally participated in the above-described violations of Mr. Martin's constitutional rights, including Mr. Martin's death.

173.     Defendant Copeland's supervisory actions as set forth herein, caused or contributed to Mr. Eurie Lee Martin's injuries, pain and suffering of mind and body, and death.

174.     Because Defendant Copeland's actions were motivated by evil motive or intent and/or involved a reckless or callous indifference to Mr. Martin's federally protected rights, an award of punitive damages against him is appropriate to the fullest extent permitted by law.

## **Count V**

### **42 U.S.C. § 1983 – Defendant Copeland's Supervisory Liability for Failure to Render Medical Aid**

175.     On July 7, 2017, Defendant Copeland was a Sergeant with the Washington County Sheriff's Office.

176.     Of the three individual defendants named in this action, Defendant Copeland was the highest ranking and had supervisory authority over Defendants Howell and Scott.

177.     Defendant Copeland personally failed to render medical aid to Mr. Martin, in response to Mr. Martin's obvious serious medical needs.

178.     Defendant Copeland was present, in close physical proximity to, and actually observed Defendants Howell and Scott fail to render medical aid for Mr. Martin's serious medical needs, even after Mr. Martin had been subjected to multiple tasings, physical assaults, and body weight suffocation.

179.     Defendant Copeland failed to take any action(s) to require Defendant Howell and Defendant Harris to render any medical aid to Mr. Martin, despite his personal knowledge that the Defendants had subjected Mr. Martin to multiple tasings, physical assaults, and body weight suffocation.

180.     Defendant Copeland personally participated in the above-described violations of Mr. Martin's constitutional rights, including Mr. Martin's death.

181.     Defendant Copeland's supervisory actions as set forth herein constituted deliberate indifference to Mr. Martin's federally secured rights.

182.     Defendant Copeland's supervisory actions as set forth herein, caused or contributed to Mr. Eurie Lee Martin's injuries, pain and suffering of mind and body, and death.

183.     Because Defendant Copeland's actions were motivated by evil motive or intent and/or involved a reckless or callous indifference to Mr. Martin's federally protected rights, an award of punitive damages against him is appropriate to the fullest extent permitted by law.

## Count VI

## Attorney's Fees and Expenses of Litigation

184.     Because of Defendants' violations of Eurie Lee Martin's rights under the Fourth Amendment and § 1983 as described above, Plaintiff is entitled to an award of costs and reasonable attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a) That the Court award Plaintiff general, compensatory, special (funeral and burial expenses), and/or punitive damages against all Defendants in an amount to be determined by the enlightened conscience of an impartial jury;

(b) That the Court grant Plaintiff her reasonable costs and attorney's fees in bringing this action in an amount to be determined at trial;

(c) That Plaintiff be granted a trial by jury on all issues so triable; and

(d) That Plaintiff be granted such other and further relief as this Court deems just and proper.

Respectfully submitted this 6th day of July 2023.

/s/ *Francys Johnson*
FRANCYS JOHNSON
Georgia Bar No. 667352
MAWULI M. DAVIS
Georgia Bar No. 212029
HAROLD W. SPENCE
Georgia Bar No. 671150
*Attorneys for Plaintiff*

**Davis Bozeman Johnson Law**
4153-C Flat Shoals Parkway
Suite 332
Decatur, GA 30034
(404) 244-2004 (Telephone)
(404) 244-2020 (Facsimile)
mdavis@davisbozemanlaw.com
hspence@davisbozemanlaw.com
fjohnson@davisbozemanlaw.com